1  FRANNY A. FORSMAN
   Federal Public Defender
2  Nevada Bar No. 00014
   RICHARD FRANKOFF
3  Assistant Federal Public Defender
   Texas Bar No. 07384300
4  411 E. Bonneville, Ste. 250
   Las Vegas, Nevada 89101
5  (702) 388-6577 voice
   (702) 388-6261 facsimile
6
   Attorney for KYLE ROHER
7

8                    UNITED STATES DISTRICT COURT
9
                          DISTRICT OF NEVADA
10

11

12  UNITED STATES OF AMERICA,          2:08-cr-92-JCM(GWF)

13                  Plaintiff,
                                       **DEFENDANT'S LETTERS IN SUPPORT**
14  vs.                                **AND SENTENCING MEMORANDUM**

15  KYLE ROHER,

16                  Defendant.

17
            Defendant, KYLE ROHER, by and through his attorney of record, RICHARD
18
    FRANKOFF, Assistant Federal Public Defender, and files this Defendant's Letters in Support and
19
    Sentencing Memorandum.
20
            DATED this 22nd day of December, 2008.
21
                                            FRANNY A. FORSMAN
22                                          Federal Public Defender

23                                             /s/ Richard Frankoff
                                            By _____
24                                              RICHARD FRANKOFF,
                                                Assistant Federal Public Defender
25

26

27

28

                                            1

**REQUEST FOR A REASONABLE SENTENCE PURSUANT TO § 3553(a)**

Pursuant to § 3553(a) and the following argument and authority, a sufficient but not greater than necessary sentence for Mr. Roher is five years probation.  Conditions of this probation should be that Mr. Roher stay the first year at a community corrections center, during the five years complete 1000 hours of community service, participate in a gambling addiction and any other therapy program deemed appropriate, maintain regular employment, pay restitution, as well as comply with the other standard conditions of probation.

**ARGUMENT AND AUTHORITY**

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008), the Ninth Circuit has held the basic framework is now settled for the district courts' task under *United States v. Booker*, 543 U.S.220 (2005): the Guidelines are no longer mandatory, but only advisory.  The overarching statutory charge for a district court is to "impose a sentence sufficient, but not greater than necessary," 18 U.S.C. § 3553(a).  The district court may not presume that the Guidelines range is reasonable, nor should the Guidelines factors be given more or less weight that any other.  While the Guidelines are to be respectfully considered, they are only one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence.  And perhaps most importantly, the district court must make an individualized determination based on the facts.

That is, the overriding principle and basic mandate of 18 U.S.C. § 3553(a) is for district courts to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing as set forth in the statute.  This language, often referred to as the "parsimony provision" is not merely another factor for the court to consider under § 3553(a); rather, it sets an independent limit on the sentence the court may impose.  This "parsimony provision" means that if a guideline sentence is longer than necessary, the court must impose a non-Guideline sentence.  A sentence which is sufficient, but not greater than necessary, should comply with the purposes set forth in § 3553(a)(2):

        (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)     to afford adequate deterrence to criminal conduct;

1        (C)     to protect the public from further crimes of the defendant; and

2        (D)     to provide the defendant with needed educational or vocational training,

3               medical care, or other correctional treatment in the most effective manner.

4 Section 3553(a) further directs sentencing courts to consider (1) the nature and circumstances of the

5 offense and the history and characteristics of the defendant; (3) the kinds of sentences available; as

6 well as (6) the need to avoid unwarranted sentencing disparities among defendants with similar

7 records who have been found guilty of similar conduct; and (7) the need to provide restitution to any

8 victims of the offense.  Put differently, district courts may no longer uncritically apply the guidelines.

9        Two similar Ninth Circuit cases may assist this court in its determination of a

10 reasonable sentence for Mr. Roher that is sufficient, but not greater than necessary.  Each case is

11 similar in nature and circumstances of the offenses: fraud or embezzlement; as well as the history

12 and characteristics of those defendants to Mr. Roher.  First, in *United States v. Whitehead*, 532 F.3d

13 991 (9th Cir. 2008), a Per Curiam opinion held that the one theme which runs through the Supreme

14 Court's recent decisions is *United States v. Booker* empowered the courts to breath life into the

15 district judges to engage in individualized sentencing.  Mr. Whitehead sold over one million dollars

16 worth of counterfeit access cards that allowed his costumers to access DirecTV digital satellite feed

17 without paying for it.  A jury convicted him of breaking various federal laws and the court calculated

18 a Guideline range of 41 to 51 months, but imposed a more lenient sentence of community service

19 and restitution.  The Ninth Circuit found no abuse of discretion in the district court's conclusion that

20 a substantial amount of community service (1000 hours), a hefty restitution order ($50,000) and a

21 five year supervised release were more appropriate than prison.

22        Next, the Ninth Circuit, in *United States v. Ruff*, 535 F3d 999 (9th Cir. 2008)

23 concluded that the district court did not abuse its discretion and the sentence it imposed was

24 reasonable.  Mr. Ruff plead guilty to several courts of health fraud, embezzlement and money

25 laundering.  Working as the Materials Supervisor at Sacred Heart Medical Center, Mr. Ruff took

26 advantage of his authority to steal $644,866 worth of inventory and sell it over eBay.  The PSR

27 calculated Mr. Ruff's guideline range as 30-37 months.  Acknowledging that he was required to

28 impose a sentence that's sufficient, but not greater than necessary to comply with the provisions of

1    the law, the judge at the original sentencing hearing then considered the sentencing factors embodied

2    in 18 U.S.C. § 3553(a).  With respect to aggravating factors, he noted the crime was serious given

3    the manner in which it was committed and the amount of property it involved.  He went on to

4    emphasize a host of mitigating factors, including: (1) Mr. Ruff's history of strong employment; (2)

5    his cooperation and clear remorse; (3) his support from his siblings; (4) the absence of potential risk

6    to the public and the appropriateness of restitution; and (5) his mental health issues and gambling

7    addiction.  With respect to this final factor, Mr. Ruff admitted that he had lost approximately

8    $200,000 to compulsive gambling, and that he had participated in counseling for pathological

9    gambling and depression between November 2005 and March 2006.  The judge observed that Mr.

10   Ruff would clearly benefit from continued mental health treatment for his illness and, considering

11   all of the factors, committed Ruff to the custody of the United States Board of Prisons ("BOP") for

12   12 months and one day, recommending that he serve his sentence at Geiger Correction Center to

13   allow him to participate in work release, get counseling and attend off-site visits with his son.  He

14   also placed Mr. Ruff on three years of supervised release.  At a hearing one week later, the judge,

15   after learning that Geiger could house Mr. Ruff only if his confinement was as a condition of

16   supervised release, amended the judgment by committing Mr. Ruff to the custody of BOP for one

17   day and placing him on three years supervised release.  As a condition of his supervised release, Mr.

18   Ruff was required to serve a term of confinement of one year and one day in a confinement facility.

19   The judge again recommended that Mr. Ruff spend this period at Geiger to facilitate his work

20   release, treatment and child visitation.

21              There are similarities between these two cases and Mr. Roher's case.  Like Mr.

22   Whitehead and Mr. Ruff, Mr. Roher took money under false pretenses.  Mr. Whitehead sold

23   counterfeit access cards; while Mr. Ruff, very much like Mr. Roher, embezzlement money from

24   an organization, Sacred Heart Medical Center, which does charitable deeds.  And like Mr. Roher,

25   Mr Whitehead and Mr. Ruff took large sums.  Mr. Whitehead sold over a million dollars of the

26   cards and Mr. Ruff stole $644,866 worth of inventory selling it over eBay.  Mr. Roher embezzled

27   over $1.8 million dollars for Nevada Power.  It appears that both Whitehead and Mr. Ruff had no

28   criminal record like Mr. Roher.  In Mr. Whitehead case, after a jury convicted him which may mean

4

1   that he did not receive the reduction for acceptance of responsibility, his guideline calculation was

2   a range of 41 to 51 months, the same as Mr. Roher's.  The guideline range for Mr. Ruff was 30-37

3   months, perhaps because of the specific offense characteristic was a lesser amount of loss.  Either

4   way, both Mr. Whitehead and Mr. Ruff faced jail time, incarceration for their crimes.

5           Yet in both cases, the district court judges felt that a probated sentence or a sentence

6   without incarceration in BOP was warranted.  For Mr. Whitehead, the judge believed that a

7   substantial amount of community service (1000 hours), a hefty restitution order ($50,000) and a five

8   year supervised release were more appropriate than prison.  And the judge sentenced Mr. Ruff to

9   the custody of BOP for one day placing him on three years supervised release.  As a condition of his

10  supervised release, the judge required Mr. Ruff to serve a term of confinement of one year and one

11  day in a confinement facility.  He also recommended that Mr. Ruff spend this period to facilitate his

12  work release, treatment and child visitation.

13          When sentencing Mr. Ruff, the district court weighed the aggravating factors against

14  the mitigating ones.  Although with respect to aggravating factors, the judge noted the crime was

15  serious given the manner in which it was committed and the amount of property it involved, he also

16  emphasized the mitigating factors, including: (1) Mr. Ruff's history of strong employment; (2) his

17  cooperation and clear remorse; (3) his support from his siblings; (4) the absence of potential risk to

18  the public and the appropriateness of restitution; and (5) his mental health issues and gambling

19  addiction.  These mitigating factors are present here.

20           There are numerous letters from friends, co-workers, and family praising Mr. Roher,

21  see Exhibits A thru N.  All these letters have a common message, Mr. Roher is a good descent family

22  man who had a secret addiction that has devastated his life.  The following are excerpts from several

23  letters that exemplify what is told in all of them.

24          Carol Cimini, a 37 year old "wife, mother, proud member of her church and a person

25  with a great respect for authority," who has been "a resident of Las Vegas for the past 28 years,"

26  wrote in her letter that she and her husband were "beyond fortune" when they moved into the house

27  across the street from the Roher family.  They lived together in an extremely close-nit cul-de-sac and

28  "fell in instant love with the Roher family."  Mrs. Cimini says, they "lived a storybook life in that

neighborhood for 12 years and Kyle was such a HUGH part of our happiness." "Kyle is an absolutely wonderful father!" "He is strict but fair and he has raised Kaylin and Karisa to be the most kind, respectful, outgoing, hilarious and intelligent girls that I have ever known- they are REALLY something special." She wishes "so desperately that you could know how much Kyle means to his daughters and how much his daughters mean to him. She wishes that you could know what a decent man he TRULY is. He has worked so hard to build the most beautiful relationship with his children; their love is infectious." Mrs. Cimini gives examples of how Kyle has "helped her in so many ways" and says, "I trust him so much! I always have and I always will." Perhaps she says it best with, "Kyle became a prisoner the moment that Kaylin and Karisa looked into his eyes are realized the rumors were true. No time served will take back the millions of tears that he and his family have shed. No time served will put the pieces back to his now failed marriage. No time served will take back the embarrassment that Kaylin and Karisa continue to face at school and ball games."

A resident of Las Vegas for over 20 years, a home owner and an active member in her church, Jennifer Snyder who now works as Chief Deputy City Clerk for North Las Vegas where she manages the Records Division, wrote in her letter that "Kyle Roher and I began working together at Nevada Power Company in July 2001." "While Kyle was employed with the Power Company he was always held in high regard." She also has been "privy to Kyle's respect and love for his children in the community." He has "faithfully provided a stable and loving home for his children." Ms. Snyder says that "Kyle was open and honest, telling me exactly what happened, all the while accepting responsibility for his actions." "He too expressed his shame and how this would negatively affect his children, his wife, his parents, and extended family." She believes that "Kyle has reached his 'rock bottom' and is capable of recovering from his sick behavior." Within the last several years she has "seen a complete transformation in Kyle's personality and lifestyle."

In her letter, Sheri Gentile who with her husband have been "friends and neighbors of the Roher family for 13 years," tells how her and her father have worked in casinos. "Between the two of us, we have witnessed many times the devastation that befalls individuals and families when someone has a gambling addiction." "Kyle talked to me about the crimes he had committed."

"I know what this town can do to someone with an addictive personality such as Kyle's.  I DO NOT condone what he did..."  "Over the past two years since his arrest," Mrs. Gentile has "seen a totally different side of this man."  "Instead of the stalwart person with an ego," she has seen Mr.  Roher "a man who has regrets for what his actions have done to his family, a man with emotions that even he didn't know he had, and also a man who is willing to stand up and pay for his mistakes."

Kenneth Lamar has been friends with Kyle "since middle school."  Prior to his being a stay at home father, Mr. Lamar was a "University of Houston Police Officer and a Correctional Officer with Galveston Sheriff's Department."  He states at the end of his letter, "[a]s a former correctional officer I know Kyle has what most inmates do not.  Kyle has a conscious and knows the difference between right and wrong."  These are but a few of the supportive and encouraging remakes in the letters from people that know Mr. Roher well.

And finally there is Mr.  Roher's letter, see Exhibit O.  His letter reveals a man who because of a denied, and therefore unattended, personal behavioral flaw, an addiction to risk taking: gambling, has destroyed a life built with hard work, determination and one with promise and hope.  But what else is revealed is a man of resiliency, willing to pick up the pieces of his life, devastated by his mistakes, and began anew.  Humility has taken the place of his confidence.  Caution rather than risk now guides him.  He is ready for the chance, for the opportunity to put his life back together and start his future.

Although all the aggravating factors in Mr. Ruff's case are present here, all if not more of the mitigating factors used by the district court to leniently sentence Mr. Ruff are also present here in Mr.  Roher's case.  As with Mr. Ruff, Mr.  Roher has a history of strong employment; he has  cooperated and is clearly remorseful; he has supported and will continue to support his family especially his two daughters and has the support of his family and many close, dear friends; because of his confronting and treating his gambling problem he is not a potential risk to the public and can make some appropriate restitution; and he has a mental health issue, a gambling addiction.  Hopefully this court will consider them and weigh them as did the judge in Mr.  Ruff's case.

A third Ninth Circuit case, *United States v. Vieke*, 348 F.3d 811 (9th Cir. 2003) may also give this court guidance with the last mitigating factor, the gambling addiction, in sentencing

1    Mr. Roher.  Although dealing in context of a Guideline's departure on the basis of aberrant behavior

2    rather than § 3552(a) factors, that case confronted the problems caused to some people because of

3    their gambling addiction and the possibility of their reform.  In that case, Ms. Vieke entered a plea

4    to one count of identity theft.  She had obtained approximately $50,000.00 in fraudulent credit card

5    charges in her parent's name.  The judge court granted a four-level departure on the basis of U.S.S.G,

6    Section 5K2.20 and sentenced Ms. Vieke to five years of probation ordering her to pay restitution

7    in the amount of $51,536.37.  Departure was justified, the district court concluded, because "there's

8    probably a coupling of the pathological nature of the [gambling] addiction that she had and it is

9    totally out of suit with the rest of her life and the behaviors that she has exhibited in her past life and

10   apparently is exhibiting since the charges in this case."  Here, as there with Ms. Vieke's, Mr.

11   Roher's criminal behavior, caused by his gambling addiction, was out of suit with the rest of his life,

12   his life before or after his committing this crime.

13            On Page 9, in Paragraph 40 and Page 10, Paragraph 41 of the PSR explains that Mr.

14   Roher is completely stressed out and feels like he needs mental health and/or counseling.  He

15   admitted he started gambling at the age 12 and was gambling at local sports books.  It also states that

16   Mr. Roher "started attending counseling with Dr. Hunter in Las Vegas Nevada for his gambling

17   addiction."  Exhibit P is a letter from Kriste Crealman, Executive Director of the Problem Gambling

18   Center, the counseling center associated with Dr. Hunter.  This letter explains that Mr. Roher was

19   interviewed with the center on May 28th, 2007 and, on that same date, was admitted into the 6-week

20   intensive out-patient program on that same date.  On July 7, 2007 Mr. Roher presented his "Life

21   Story" and was awarded his certificate of completion, see Exhibit Q.  Exhibit R is the program

22   brochure for "the problem gambling center" explaining its goals, techniques and approach.  It states,

23   [o]ver the years this program has treated thousands of Las Vegans and served as a model for other

24   treatment programs around the world."  Also, "[t]his program is a success and has been recognized

25   by dozen of national news programs, state government, and nations...Thousands of residents have

26   quietly but determinedly turned their lives around and because problem gambling is so often an

27   'invisible' affliction, these are people who may well be your child's teacher, your neighbor's police

28   officer, your local banker, or your family physician."  "[T]he psychological community has long

1   recognized problem gambling as a treatable disorder..."  The brochure explains that "[t]hough

2   treatment is individualized, it relies heavily upon a three-pronged approach:" education, peer

3   counseling and classic therapy.  "Problem gambling is not a disorder that discriminates - it affects

4   individuals from all walks of life.  Fortunately, this is not a permanent sentence - and many have

5   actually found their lives more rewarding than ever after going through the PGC program."

6          It should be noted that the indictment in this case was filed on April 3, 2008, almost

7   a year after Mr. Roher sought professional help for his gambling addiction.  Although he was caught,

8   he sought this help before criminal charges were filed, without the advice or direction of counsel and

9   on his own because of his awareness of his addictive gambling problem and his desire for help and

10  reformation regardless of the outcome of his case.

11         Mr. Roher's efforts at rehabilitation did not stop then.  After being referred by

12  Pretrial Services to Jennifer Gilroy, M.S., MFT, LADC,  who diagnosed Mr. Roher with 312.31

13  Pathological Gambling based on DSM-IV criteria, see Exhibit S, later returning to his supportive

14  family near Houston, Texas and again upon Pretrial Services' recommendation, he began attending

15  individual therapy sessions with Barbara S.  Levinson, Ph.D., see Exhibit T.  In her letter, Dr.

16  Levinson details Mr. Roher's family history which includes that "his father is also a gambling addict

17  with alcohol problem."  She explains that "research shows that a history of addiction in the family

18  is a predisposing factor to the development of an addiction disorder."  Dr. Levinson concludes that

19  "Mr. Roher understands the seriousness of his past behavior and the severe consequences to himself

20  and more importantly, the victims of his crime, including his wife, children and parents.  He has been

21  diligent in his attendance of therapy sessions and has been compliant with all I have asked him to

22  do.  He is despondent over his circumstances and is remorseful and disappointed in himself."  Dr.

23  Levinson suggest that "[i]f Mr.  Roher is given Probation, he must engage in consistent attendance

24  at 12-step meetings, group therapy, individual therapy, and possible family therapy."  Mr.  Roher

25  continues to sees Dr.  Levinson for his therapy with her.  This court, as the judge in the *Vieke* case,

26  hopefully should take Mr. Roher's serious efforts to deal with his gambling addiction into

27  consideration when sentencing him.

28         It is respectfully requested that pursuant to § 3553(a) and the above argument and

9

1    authority, that Mr. Roher be sentenced to five year probation, a sufficient but not greater than

2    necessary sentence.  Conditions of this probation should be that Mr. Roher stay the first year at a

3    community corrections center, participate in a gambling addiction and any other therapy program

4    deemed appropriate, maintain regular employment, pay restitution, complete during the five years

5    1000 hours of community service, as well as comply with the other standard conditions of probation.

6         DATED this 22nd day of December, 2008.

7                                                 FRANNY A. FORSMAN
                                                  Federal Public Defender
8
                                                  /s/ Richard Frankoff
9
                                                  By _____
10                                                      RICHARD FRANKOFF,
                                                        Assistant Federal Public Defender
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF ELECTRONIC SERVICE

2

3       The undersigned hereby certifies that she is an employee of the Law Offices of the

4  Federal Public Defender for the District of Nevada and is a person of such age and discretion as to

5  be competent to serve papers.

6       That on September 18, 2008, she served an electronic copy of the above  and

7  foregoing **Motion to Dismiss Based on a Prior Unlawful Deportation** by electronic service (ECF)

8  to the person named below:

9

10              GREGORY A. BROWER
               United States Attorney
11              JEFFREY TAO
               Assistant United States Attorney
12

13

14                              /s/ Eleanor Dolan

15                              _____
                              Eleanor Dolan, an employee of the Law
16                              Offices of the Federal Public Defender

17

18

19

20

21

22

23

24

25

26

27

28